# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

## CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>               Plaintiff,<br><br>vs.<br><br>PETER ANTONIO TUBENS,<br><br>               Defendant. | ORDER<br><br>AND<br><br>MEMORANDUM DECISION<br><br>Case No. 2:11-CR-579-TC |

Defendant Peter Antonio Tubens filed a motion to suppress evidence seized during a June 7, 2011 warrantless search of luggage on a Greyhound Bus that had stopped in Green River, Utah, for a routine passenger break. Mr. Tubens contends that the officers illegally searched all of his luggage after alerts by two certified narcotics detection dogs did not lead the officers to any contraband in Mr. Tubens's checked bag in the bus cargo compartment. According to Mr. Tubens, the officers should have stopped their investigation at that point because they lacked reasonable suspicion or probable cause to detain him and search his carry-on luggage. The court finds that Mr. Tubens's constitutional rights were not violated and that the carry-on bag containing methamphetamine had been abandoned at the time it was searched. Accordingly, Mr. Tubens's Motion to Suppress is DENIED.

**FACTUAL BACKGROUND**[1]

At 10:15 a.m. on the morning of June 7, 2011, Utah Highway Patrol Sergeant Steve Salas and Deputy Blake Gardner of the Emery County Sheriff's Office were on patrol on Interstate 70 as part of their drug interdiction duties. Both officers handle certified narcotics detection dogs.

Sergeant Salas routinely checks Greyhound buses with his dog, Duke, as part of his drug interdiction activities. Duke, a Belgian Malinois certified by Utah P.O.S.T.[2] in narcotics detection and patrol apprehension, is trained to detect the odor of marijuana, cocaine, heroin, and methamphetamine. If Duke detects the odor of a drug, he either alerts or indicates to a particular area of interest. An "indication" is an aggressive sign (for example, scratching with both front paws) that the dog smells the strong odor of drugs. An "alert" is a less aggressive sign that the dog smells a fainter odor of drugs. According to Sergeant Salas, who is a certified dog trainer,

> [a]n alert is more of a transition from just a general search to pinpointing an area where you can see the searching behavior changes. The dog may . . . close his mouth. He's focusing in on a specific area, not leaving the area, and the sniffing is more intense. But for whatever reason, whether there's not enough odor or there's – or he can't – cannot pinpoint the source, he does not give that final – final response indication. . . . An alert is whether it's a residual odor or just a small amount of odor or it's just the fringe of the odor that he's hitting, but he's not able to pinpoint the source of the odor or there's not enough odor to induce that dog to go into that final response.

(Tr. of July 25, 2012 Evidentiary Hr'g ("Tr.") (Docket No. 18) at 17-18.) The odor of a narcotic drug can remain in a place where drugs were originally located but later removed. "Basically what the dog is alerting to or detecting is the residual odor of the narcotic itself." (Id. at 9.)

According to Sergeant Salas, he typically follows the same routine when he checks buses

---

[1] The facts are taken from the evidence presented during a July 25, 2012 hearing.

[2] P.O. S.T. stands for "Police Officer Standards and Training."

traveling on the interstate. After receiving permission from the driver, he lets the dog climb into the luggage compartment. If the dog alerts or indicates to a particular bag, the officer checks the identification tag and looks for the owner of the bag to ask for consent to search the bag. To find the owner of the bag, the officer waits for all the passengers to board the bus and then he goes into the passenger area of the bus and asks for the owner.

That day in June, as part of their routine, the two officers followed a Greyhound bus into Green River, Utah. The bus stopped at the West Winds Truck Stop for a scheduled twenty-minute passenger break. The officers planned to get permission from the bus driver to allow their dogs to sniff the luggage compartment of the bus.[3] Soon after they pulled into the truck stop parking lot, a second Greyhound bus also pulled in for a passenger break.

Sergeant Salas, after receiving permission from the driver of the first bus, let his dog climb into the luggage compartment to sniff for narcotics. Deputy Gardner did the same with the second bus, using his dog Niko (Niko is trained and certified in the same manner as Duke).

In the first bus, Duke did not alert to anything suspicious. As Sergeant Salas was walking Duke back to the patrol car, Deputy Gardner came up to Sergeant Salas and requested that Duke sniff the luggage compartment of the second bus. Deputy Gardner did not point out any particular area within the luggage compartment of the second bus. Duke went into the luggage compartment of the bus and alerted when he came to a black canvas suitcase. Sergeant Salas testified that "as [Duke] was searching, I noticed he focused his sniffing specifically on this bag.

---

[3] A Greyhound bus luggage compartment is located in the lower portion of the bus directly below the seats in between the front and rear axle. To get to the luggage, a door on the outside of the bus is opened.

He wouldn't leave the bag for four to five seconds, closed mouth, intense sniffing, but he never gave a final response by scratching[.]" (Tr. at 17.) He said, "the dog [was] not indicating aggressively, but he [was] alerting. It [was] a strong alert, which [was] telling me that there's narcotic odor inside that . . .bag." (Tr. at 38.)

Sergeant Salas then told Deputy Gardner that Duke had alerted to the suitcase. Deputy Gardner confirmed to Sergeant Salas that his dog Niko has also alerted to the same suitcase. They took the suitcase out of the bus and looked at its Greyhound identification tag, which listed Peter Tubens as the owner and Philadelphia as the final destination.

To locate Mr. Tubens, Sergeant Salas, who was in uniform, got on the bus (after all the passengers had boarded), stood by the driver's seat, and asked in a sufficiently loud but non-threatening voice if there was a passenger on board named Peter Tubens. The passengers on the bus were very quiet when Sergeant Salas spoke. Sergeant Salas called the name several times and waited for a response. (During the hearing, Sergeant Salas demonstrated the volume with which he called out Mr. Tubens' name. Sergeant Salas's voice was clear, and the court is convinced that anyone on the bus who did not have a hearing disability would have heard Sergeant Salas's request.) No one responded, so Sergeant Salas left the bus and asked Deputy Gardner to board the bus with him. He testified that,

> Once I got on the bus [the second time], I asked the passengers of the bus to get out their Greyhound bus ticket and have it available. I went through and started looking at each ticket, trying to locate Mr. Tubens.

(Tr. at 21.)

He did locate Mr. Tubens, who was a passenger on the bus (and had been when Sergeant Salas initially called out his name minutes before). Sergeant Salas asked Mr. Tubens why he had

4

not responded to the initial inquiry, and Mr. Tubens said he did not hear Sergeant Salas call his name. There is no evidence in the record that Mr. Tubens had a hearing disability at that time. Sergeant Salas then asked Mr. Tubens whether he would get off the bus. Mr. Tubens agreed to Sergeant Salas's request.

Once they were outside, Deputy Gardner asked Mr. Tubens if the suitcase belonged to him. Mr. Tubens said yes, and upon being asked, gave permission to search.

While Deputy Gardner began searching the suitcase, Sergeant Salas asked Mr. Tubens if he had carry-on luggage on the bus. According to Sergeant Salas,

> [B]ased on my experience, I have seen where people who are in possession of contraband or narcotics in one piece of luggage may have contraband in another piece of luggage. I have also seen where they've taken narcotics or contraband from a bag underneath the bus and placed it in another bag on the bus.

(Tr. at 25.) But Mr. Tubens said he did not have any carry-on luggage.

Deputy Gardner continued his search of the suitcase, and Sergeant Salas went back on the bus to look for pieces of luggage in or near Mr. Tubens' seat. He saw a small, square canvas case (it was later discovered to be a CD case) and a paper sack on the luggage rack directly above the seat. He attempted to identify which bags on the bus belonged to whom. A woman sitting directly in front of Mr. Tubens' seat told Sergeant Salas that Mr. Tubens had pushed some bags forward on the shelf toward her seat and her carry-on luggage.

At that point, Sergeant Salas asked the passengers to place their carry-on luggage on their laps so he could sort out and identify the owners of all the carry-on items on the bus. In the meantime, he took the paper sack and CD case out of the bus and asked Mr. Tubens if those two items belonged to him. Mr. Tubens, who had originally told Sergeant Salas that he did not have

5

any carry-on luggage, said they were his. After asking for and receiving permission from Mr. Tubens to search the two items, Sergeant Salas searched the paper sack and the CD case, neither of which contained contraband. About the same time, Deputy Gardner told Sergeant Salas that he had not found any contraband in the suitcase.

Sergeant Salas went back on the bus to look for abandoned pieces of carry-on luggage. He saw a black bag in the area where Mr. Tubens had been sitting. He held it up for the passengers to see and asked in a clearly audible voice whether that piece of luggage belonged to anyone inside the bus. No one claimed the bag. So Sergeant Salas took it out of the bus, showed it to Mr. Tubens, who had been outside the bus all this time, and asked Mr. Tubens whether the black bag belonged to him. Mr. Tubens said it did not. Sergeant Salas then explained to the bus driver that the black bag was abandoned and that no one was claiming it. He asked the driver for permission to search the bag. The driver stated that if no one was claiming the bag the officer was allowed to search it. Upon opening the black bag, Sergeant Salas found two "cylinder-shaped packages wrapped in a plastic wrap, a lighter white colored package which [he] suspected was methamphetamine." (Tr. at 29.) He also found a prescription medication bottle with Mr. Tubens' name on it. The officers then arrested Mr. Tubens.

Although approximately one hour passed between the time the bus stopped for the passenger break and the time Mr. Tubens was arrested, the period between identification of Mr. Tubens and his arrest was approximately twenty minutes.[4]

---

[4]Sergeant Salas testified that from the time Mr. Tubens first got off the bus until Sergeant Salas brought out the two carry-on items he first located in the overhead shelf, approximately ten minutes had elapsed. (See Tr. at 44.) He further testified that from that point until he located the suspected drugs and arrested Mr. Tubens, another ten minutes had elapsed. (Tr. at 50-51.)

## ANALYSIS

Mr. Tubens now asks the court to suppress the evidence found in that black carry-on bag. The central issue in this case is whether the black bag was voluntarily abandoned. If it was, the search was legal.[5] See United States v. Ojeda-Ramos, 455 F.3d 1178, 1186 (10th Cir. 2006) (voluntarily "abandoned property may be seized and searched without a warrant.") If, however, the owner's abandonment of the bag was due to illegal actions by the officers, then, as a matter of law, the bag was not voluntarily abandoned and any search without the owner's consent (and without a warrant) was unconstitutional.

Mr. Tubens does not challenge the officers' use of dogs to sniff the luggage compartment. But he contends that after he gave the officers permission to search the suitcase and they found nothing illegal, all reasonable suspicion dissipated. At that point, he says, the officers were obligated to stop the investigation and let Mr. Tubens continue on his way. Mr. Tubens argues that the continued detention violated his Fourth Amendment rights and that such illegal detention forecloses a finding that the black carry-on bag was voluntarily abandoned. It follows, he concludes, that the warrantless search of the black bag violated his Fourth Amendment rights and so the seized evidence must be suppressed.

In response, the Government contends that the encounter between Sergeant Salas and Mr. Tubens was consensual and so Mr. Tubens was not unlawfully detained. In the alternative, the Government argues that even if Mr. Tubens was detained, the detention was lawful because

---

[5] "'Abandonment is akin to the issue of standing because a defendant lacks standing to complain of an illegal search or seizure of property which has been abandoned.'" United States v. Ojeda-Ramos, 455 F.3d 1178, 1187 (10th Cir. 2006) (quoting United States v. Garzon, 119 F.3d 1446, 1449 (10th Cir. 1997)).

Sergeant Salas had continuing reasonable suspicion. The Government asserts that under either scenario, the circumstances support a finding that the black carry-on bag was voluntarily abandoned and lawfully searched.

For purposes of analysis, the court assumes, without deciding, that Mr. Tubens was seized during his encounter with the officers. The court need not reach this issue because even if Mr. Tubens was detained, the detention was supported by reasonable suspicion and was reasonable in length, so it was lawful. Based on this finding and the undisputed fact that Mr. Tubens expressly disclaimed ownership of the black bag, the court holds that the black bag was voluntarily abandoned and the subsequent search lawful.

**1. Sergeant Salas had reasonable suspicion to conduct the investigation leading to Mr. Tubens' arrest.**

A police officer may, in appropriate circumstances, briefly stop a person to investigate suspected criminal activity. Illinois v. Wardlow, 528 U.S. 119, 123 (2000) (investigative detention supported when officer has reasonable articulable suspicion that criminal activity was "afoot") (citing Terry v. Ohio, 392 U.S. 1, 22, 30 (1968)). Such action is known as a Terry stop or investigative detention. An investigative detention is valid under the Fourth Amendment if the detention is (1) justified at its inception and (2) reasonably related in scope to the circumstances that justified the stop in the first place. United States v. DeJear, 552 F.3d 1196, 1200 (10th Cir. 2009).

A stop is justified at its inception if the officer has reasonable articulable suspicion that the person was committing or had just committed a crime. Id.; United States v. Henning, 906 F.2d 1392, 1395 (10th Cir. 1990). "Reasonable suspicion is defined as [a] 'particularized and

objective basis for suspecting the particular person stopped of criminal activity.'" United States v. Guerrero, 472 F.3d 784, 787 (10th Cir. 2007) (quoting United States v. Cortez, 449 U.S. 411, 417-18 (1981)).  The court must consider the totality of the circumstances to determine whether reasonable suspicion existed.  United States v. Sokolow, 490 U.S. 1, 8 (1989).  Moreover, the "level of suspicion required for reasonable suspicion is 'considerably less' than proof by a preponderance of the evidence or that required for probable cause."  United States v. Lopez, 518 F.3d 790, 799 (10th Cir. 2008) (quoting Sokolow, 490 U.S. at 7).

Although it does not appear that Mr. Tubens challenges Sergeant Salas's boarding of the bus to ask the passengers for their tickets, even if he does, Sergeant Salas had reasonable suspicion at that point to continue his investigation.  Specifically, Sergeant Salas knew that two trained dogs independently alerted to the same bag belonging to passenger Peter Tubens, who did not respond to Sergeant Salas's clear and audible inquiry about whether Peter Tubens was on the bus.  See United States v. Parada, 577 F.3d 1275, 1281, 1282 (10th Cir. 2009) (noting that under Tenth Circuit case law, "a positive dog alert gives officers probable cause to search" and indicates a "fair probability" that contraband is in the container); United States v. Ojeda-Ramos, 455 F.3d 1178, 1183 n.9 (10th Cir. 2006) (holding that officer reasonably suspected that one or more bus passengers owned a suitcase on which a dog had alerted to the odor of drugs, and quoting officer's testimony "that ninety percent of the time, 'if there's a bag on the bus, there's going to be a passenger attached to it[.]'").

The fact that the search of the suitcase did not reveal any contraband did not dissipate the reasonable suspicion Sergeant Salas had developed during the investigation.  Under the totality of the circumstances, he was not required to stop the investigation.  See, e.g., United States v.

9

Ramirez, 342 F.3d 1210, 1212-13 (10th Cir. 2003) (failure of qualified drug dog to alert to package did not *per se* require the investigation to stop, particularly given other facts known to the officer at the time); United States v. Glover, 104 F.3d 1570, 1577 (10th Cir. 1997) (holding that a drug dog's failure to alert does not require an officer to end the investigation, but rather "[t]he determination of whether there was a substantial basis for concluding probable cause existed must be based on the totality-of-the-circumstances."). Indeed, despite the fact that no drugs were found in the suitcase, other circumstances maintained, even heightened, Sergeant Salas's reasonable suspicion.

For instance, although Mr. Tubens was on the bus when Sergeant Salas initially called out his name, he did not respond. Mr. Tubens' later explanation to Sergeant Salas that he did not hear the inquiry is questionable. The passenger compartment on the bus was quiet when Sergeant Salas boarded and asked for Mr. Tubens. Sergeant Salas's voice (as demonstrated during the evidentiary hearing) was clear and audible, and there is no evidence that Mr. Tubens is hard of hearing or was otherwise impaired at the time. A reasonable officer could conclude that Mr. Tubens did not want to be found and had something to hide.

In addition, Mr. Tubens provided inconsistent answers to questions about whether he had any carry-on luggage (first he said he had no carry-on luggage, but when faced with the first two items found on the bus above Mr. Tubens' seat, admitted they were his). Mr. Tubens' problematic answers were compounded by the female passenger's comment that Mr. Tubens was pushing bags away from his seat toward hers.

And even though the search of the paper sack and CD case revealed no drugs, the totality of the circumstances supported Sergeant Salas's continuing reasonable suspicion. Sergeant Salas

knew from his training and experience that the absence of drugs in the bag to which the dogs had alerted was not conclusive, because a trained dog may alert to the residual odor of narcotics rather than to drugs actually located in the container. He also testified that,

> based on my experience, I have seen where people who are in possession of contraband or narcotics in one piece of luggage may have contraband in another piece of luggage. I have also seen where they've taken narcotics or contraband from a bag underneath the bus and placed it in another bag on the bus.

(Tr. at 25.) It was reasonable for Sergeant Salas to confirm that Mr. Tubens had no other carry-on luggage on the bus. Given Mr. Tubens' inconsistent, and apparently evasive, answers about carry-on luggage, Sergeant Salas reasonably continued his investigation to identify the status of all carry-on luggage on the bus. He located a lone, unclaimed bag in the area where Mr. Tubens sat and where Mr. Tubens had been pushing bags toward the female passenger's seat. This was another fact contributing to Sergeant Salas's overall suspicion that Mr. Tubens was attempting to hide illegal drugs.

All of the circumstances above provided a sufficient basis to detain and question Mr. Tubens during the investigation.[6] Accordingly, the court holds that Mr. Tubens' Fourth Amendment rights were not violated.

**2.    Mr. Tubens voluntarily abandoned the black carry-on bag.**

Because the officers did not conduct an unlawful investigation, the only issue left to determine is whether Mr. Tubens expressly disclaimed ownership of the black carry-on bag. The test for abandonment, i.e., whether the individual retained a reasonable expectation of privacy in

---

[6]The length of detention—approximately twenty minutes—was reasonable, particularly given Mr. Tubens' failure to identify himself when Sergeant Salas first asked whether a person named Peter Tubens was on the bus.

the object, is an objective one. United States v. Hernandez, 7 F.3d 944, 947 (10th Cir. 1993).

Here, the record is clear. Sergeant Salas presented the black carry-on bag to Mr. Tubens and asked Mr. Tubens if the bag was his. Mr. Tubens said it was not. This express and unequivocal disclaimer of ownership constitutes voluntary abandonment. Ojeda-Ramos, 455 F.3d at 1187; United States v. Denny, 441 F.3d 1220, 1223,1227 (10th Cir. 2006).[7] The fact that Mr. Tubens was detained and being questioned does not make his express disclaimer any less voluntary. See Hernandez, 7 F.3d at 947 ("[P]olice pursuit or investigation at the time of abandonment of property, without more, does not of itself render abandonment involuntary.").

Because the black bag was abandoned, Sergeant Salas's warrantless search of its contents was lawful. See United States v. Ojeda-Ramos, 455 F.3d 1178, 1186 (10th Cir. 2006) (voluntarily "abandoned property may be seized and searched without a warrant.").

**ORDER**

For the foregoing reasons, Defendant Peter Antonio Tubens' Motion to Suppress (Docket No. 13) is DENIED.

DATED this 10th day of December, 2012.

BY THE COURT:

*Tena Campbell*
TENA CAMPBELL
U.S. District Court Judge

---

[7] Mr. Tubens relies on United States v. Garzon, 119 F.3d 1446 (10th Cir. 1997), but Garzon is distinguishable. First, the Garzon court found the detention unlawful. Second, Mr. Garzon never verbally disclaimed an interest in the backpacks.

12